# EXHIBIT B

# AFFIDAVIT OF EILEEN L. MORRISON

I, Eileen L. Morrison, state the following to be true to the best of my knowledge, information, and belief:

1. I am an attorney licensed to practice in the Commonwealth of Massachusetts.
2. Since 2016, I have represented clients and provided mentorship for other lawyers on numerous cases involving Cambodian Americans facing deportation, the majority of whom have decades-old final orders of removal due to criminal convictions. I have also presented numerous times regarding the topic of Cambodian American deportation, including presentations to students at UMass Medical School and Harvard College and to the broader community at University of Massachusetts Lowell's Southeast Asian American Studies Conference. I have also provided community-based information sessions, including at the Cambodian Mutual Assistance Association in Lowell.
3. I am an adjunct professor at the University of Massachusetts Lowell. I have taught Immigration Law to undergraduate students since 2020.
4. In 2006, I studied abroad for a semester in Cambodia. I studied Cambodian history and the Khmer (Cambodian) language. Subsequently, I traveled to Cambodia in 2009 in 2015.
5. I am conversant and literate in Khmer.
6. Prior to attending law school, I worked at the Southeast Asia Resource Action Center (SEARAC) from 2009 to 2012. During my work at that organization, I first gained knowledge regarding the deportation of Southeast Asian Americans, Cambodian Americans in particular. I met numerous Southeast Asian Americans facing deportation.

## Cambodia-Specific Deportation Process

7. Based on my experience representing Cambodian Americans facing deportation, and based on information gathered from other attorneys doing similar work across the United States, I am familiar with the logistics behind the process by which the Department of Homeland Security seeks to deport Cambodian nationals from the United States.
8. For many years, Cambodia did not accept repatriations of its nationals. Due to the United States' inability to return nationals of Cambodia (and other countries), noncitizens whom the United States government sought to deport languished in indefinite immigration detention. Two noncitizens sued, including a Cambodian national named Kim Ho Ma. The Supreme Court placed a presumptive six-month limit on immigration detention when the United States was unable to effectuate deportation. *See Zadvydas v. Davis*, 533 U.S. 678 (2001).

9. Soon after the *Zadvydas* decision, the United States government pressured the Cambodian government to sign a Memorandum of Understanding, using threats to refuse issuance of visas to Cambodians seeking to enter the United States. Saing Soenthrith, *Gov't Strikes Deal to Accept Cambodians Convicted in US*, Cambodia Daily (May 3, 2002), https://english.cambodiadaily.com/2002/05/03/govt-strikes-deal-to-accept-cambodians-convicted-in-us.

10. When the United States seeks to deport a person to Cambodia, the United States notifies Cambodian authorities and requests that the Cambodian government issue a travel document for the person. The need for a travel document typically arises because most Cambodian Americans facing deportation arrived in the United States as refugees and lacked identification documents establishing Cambodian citizenship.

11. The presence of the Cambodian community in the United States was primarily driven by the war in Southeast Asia, commonly referred to in the United States as the "Vietnam War." From 1954 to 1975, the United States was heavily involved not just in Vietnam but also Cambodia and Laos. The United States conducted significant military actions in each country, including covert operations and bombing campaigns.

12. In April 1975, the United States withdrew from Vietnam and ended its operations in Cambodia and Laos. In its wake, the region experienced significant destabilization and humanitarian crisis. From 1975 to 1979, the Khmer Rouge regime ruled the entirety of Cambodia. The Khmer Rouge forced the entire Cambodian population into agricultural labor camps or conscripted them into military service as Cambodia fought against Vietnam. Nearly everyone lost all of their possessions, including important documents such as any birth certificates. Additionally, no birth certificates or other identification documents were issued during the Khmer Rouge regime.

13. In January 1979, the Vietnamese military invaded Cambodia, ending the Khmer Rouge regime. Significant numbers of refugees fled to refugee camps in Thailand. Those born in refugee camps were also not issued birth certificates. Many of these refugees were resettled in the United States – approximately 1.1 million. SEARAC, *Southeast Asian Journeys* at 5 (2020), *available at* https://searac.org/wp-content/uploads/2024/10/SEAA-Journeys_final.pdf.

14. In part due to the loss or lack of issuance of identification documents as described above, the Cambodian government requires that each potential deportee to be interviewed by the Cambodian consulate before the Cambodian government will make a decision whether or not to issue a travel document. I am aware of this process based on my representation of Cambodian Americans and from discussions with other lawyers and community advocates working with Cambodian Americans facing deportation. Additionally, this process is described in *Kong v. United States*, 62 F.4th 608, 610 (1st Cir. 2023) (describing the United States requesting a travel document from the Cambodian

government, a subsequent interview between the potential deportee and the Cambodian consulate, and then the issuance of a travel document by Cambodia).

15. I have personally previously represented a Cambodian American who was interviewed by the Cambodian consulate while in immigration detention. After this interview, the Cambodian government declined to issue travel documents based on their belief that he was not a Cambodian national, but rather a Vietnamese national.

**Mr. Kchang Pen's ICE Check-In on February 2, 2026**

16. I accompanied Mr. Pen to his check-in at the Burlington ICE office on February 2, 2026, where I provided a fully executed G-28 to the ICE officer.

17. They asked Mr. Pen several questions regarding possible forms of relief, such as whether he has U.S. citizen family members.

18. Mr. Pen was handcuffed and taken to the back.

19. The officer never said that ICE already had travel documents for Mr. Pen.

20. I requested a copy of the revocation of release notice and was told that would be completed after Mr. Pen was detained.

Signed under the pains and penalties of perjury this 2nd day of February 2026.

*/s/ Eileen L. Morrison*
Eileen L. Morrison (BBO #694208)