**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| KCHANG PEN,<br><br>Petitioner,<br><br>v.<br><br>DAVID WESLING, Acting Director of the Boston Field Office, U.S. Immigration and Customs Enforcement, *et al.*,<br><br>Respondents. | ) | Case No. 1:26-cv-10510-RGS<br><br>**ORAL ARGUMENT REQUESTED** |

# PETITIONER'S SUR REPLY IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Kchang "Brian" Pen has been in compliance with his Order of Supervision ("OSUP") for nearly 25 years. On February 2, 2026, he continued to comply with all of the conditions of his OSUP and appeared at the ICE Burlington Field Office, knowing that the government intended to detain him that day. *See Nguyen v. Moniz*, No. 26-CV-10741-FDS, 2026 WL 539181, at *4 (D. Mass. Feb. 26, 2026) (finding that compliance with OSUP weighed heavily in favor of petitioner and ordering habeas release); *see also Sun v. Noem*, No. 3:25-cv-02433-CAB-MMP, 2025 WL 2800037, at *3 (finding that the government failed to show detention was necessary where it provided no facts demonstrating that petitioner, if released, would be "unwilling or unable to provide the information needed for Respondents to pursue Petitioner's removal" or would fail to comply once removal documentation was secured).

ICE has deprived Mr. Pen of his liberty for over a month, and this Court has given the government a generous amount of time and opportunity to meet its burden to show that there has

been an "individualized determination" that "removal has become significantly likely in the reasonably foreseeable future" prior to revocation of release. *Kong v. United States*, 62 F.4th 608, 619-20 (1st Cir. 2023) (citing 8 C.F.R. § 241.13(i)(2)); *see Romero Marroquin de Rodriguez v. Hyde*, No. 25-CV-13210-AK, slip op. at 7-8 (D. Mass. Jan. 28, 2026) (reaffirming that "'ICE, like any agency, has the duty to follow its own regulations'" and that the Supreme Court "has never given ICE a carte blanche to re-incarcerate someone without basic due process protection" (quoting *Rombot v. Souza*, 296 F. Supp. 3d at 388–89)). However, the government's "Response to ECF No. 13" (hereinafter "ECF 14") demonstrates that the government did not make the proper regulatory determination to revoke Mr. Pen's release in the first instance, as no travel document request was even submitted at the time of revocation, which alone warrants his release. ECF 14-1, at 19. In fact, after over one month, there is still no travel document or planned removal for Mr. Pen.

This Court should order the immediate release of Mr. Pen due to the government's violations of the regulations and Mr. Pen's due process rights. Should the government wish to continue trying to obtain a travel document for Mr. Pen, this can be accomplished with Mr. Pen out of custody.

## I. Despite multiple opportunities to do so through multiple rounds of briefing, Respondents failed to show that they made a proper determination in the first instance prior to re-detention, warranting Petitioner's immediate release.

Respondents have still failed to show that they followed their own regulations in re-detaining Mr. Pen. Respondents claim "significant discretion," but that discretion is not unfettered. ECF 12 at 1. The government must still meet the regulatory standard of making a "foreseeability determination" in the first instance before arresting Mr. Pen. For 25 years, Mr. Pen has remained compliant with the terms of his OSUP release, and ICE has not alleged any

violations of his OSUP release. Proof of Check-Ins; ECF 7; ECF 12; ECF 14. Therefore, to justify Mr. Pen's re-detention, ICE was obligated **at the time of re-detention** to provide specific facts supporting "(1) an **individualized** determination (2) by ICE that, (3) based on changed circumstances, (4) removal has become significantly likely in the reasonably foreseeable future." *Kong*, 62 F.4th at 619–20 (citing 8 C.F.R. § 241.13(i)(2)) (emphasis added). As part of this determination, ICE must have reviewed "all facts of the case" to determine whether prospects for timeliness of removal are "reasonable under the circumstances" and must have afforded an individual an opportunity to rebut the Government's assertion that their deportation is reasonably foreseeable. 8 C.F.R. §§ 241.13(f), (i)(3).

Persons with final removal orders are entitled to reasonable restraints from detention after their post-order removal period. Under *Zadvydas*, noncitizens have liberty interests protected by the Constitution such that the government may detain noncitizens only "in certain special and 'narrow' nonpunitive circumstances, [where] a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint." 533 U.S. at 690. This includes individuals subject to a final order of deportation. *Id.* at 693–94, 721 (Kennedy, J., dissenting) ("[A]liens are entitled to be free from detention that is arbitrary or capricious.").

Although ICE has the authority to revoke release, as noted above, the circumstances in which it can revoke release is governed by its own regulations under 8 C.F.R. § 241.13. ICE must meet a high threshold, showing that removal is significantly likely to occur in the reasonably foreseeable future. *See Vo v. Lyons*, No, 1:25-cv-533-JL-TSM, 2026 WL 323133, at *4 (D.N.H. Jan. 27, 2026) (reaffirming that "[o]nce the government elects release subject to supervision, it is bound by its own regulations governing revocation.") Furthermore, this determination must be ***individualized*** and made by ICE ***prior*** to revocation of release and

re-detention. *See Kong*, 62 F.4th at 619-20; *Nguyen v. Moniz*, No. 26-CV-10741-FDS, 2026 WL 539181, at *4 (D. Mass. Feb. 26, 2026) (finding that the government erred when it did not initiate a request for travel documents prior to detaining the noncitizen and ordering habeas relief) (emphasis added). ICE did not meet either of these obligations prior to revoking Mr. Pen's release. In fact, ICE did not even initiate the process of requesting travel documents for Mr. Pen until February 18, 2026, over two weeks after his re-detainment. ECF 14-1 at 5. *Contra Tran v. Baker*, No. 1:25-CV-01598-JRR, 2025 WL 2085020, at *4 (D. Md. July 24, 2025), *corrected*, No. 1:25-CV-01598-JRR, 2025 WL 2087124 (D. Md. July 24, 2025) (denying habeas petition where petitioner had a pending travel document request to Vietnam for an extended period of time *prior* to re-detainment). ICE must follow its own regulations prior to re-detaining individuals to provide an individual with due process, and ICE has failed to do so in Mr. Pen's circumstances.

In re-detaining Mr. Pen and even now, five weeks later, in their third Reply, Respondents have failed to meet their burden to show that changed circumstances have occurred. ECF 14. Although Respondents allege that Mr. Pen's OSUP was revoked "to enforce Petitioner's removal order," they have only referenced generalized "changed circumstances" regarding a single paragraph in a "Reciprocal Trade Agreement" from October 2025[1] and generalized statistics regarding deportations to Cambodia without particularity to Mr. Pen's circumstances. ECF 7 at 2; ECF 7-1.

For almost 25 years, since 2002, Cambodia has had a Memorandum of Understanding ("MOU") with the United States to accept back deportees. The government still has not provided

[1] ECF 14-2. The Agreement is 27 pages long and is focused primarily on tariffs, quotas, and trade in goods. Only one paragraph addresses repatriation of Cambodian nationals.

an explanation as to why they have not attempted to repatriate Mr. Pen in the past 25 years, even though Mr. Pen reported to ICE dozens of times since then.

## II. There were no changed circumstances to justify re-detention.

The MOU between the United States and Cambodia, which governs any potential repatriation, clearly requires a "case-by-case" analysis of each individual's circumstances prior to issuance of travel documents to Cambodia. As the government admits, not *all* requests for travel documents are granted. ECF 14 at 3–4, 6–7. Since February 2025, only 79% of requests for travel documents for detained individuals resulted in the issuance of travel documents. *Id*. Respondents do not provide evidence that the travel documents issued were for individuals with any similarities to Petitioner, beyond the fact that they are detained—a circumstance of their own creation. *Id*. The government proffers no individual reason to believe that Mr. Pen in particular will be granted a travel document, only a general statement that it believes that "there is a significant likelihood of removal in the reasonably foreseeable future for ***all*** Cambodian citizens and nationals." ECF 14 at 2-3 (emphasis added).

Respondents allege that the provision in the October 2025 Reciprocal Trade Agreement between the United States and Cambodia has changed the situation. Even taking that assertion as true, that agreement on its face states that Cambodia will agree to the repatriation of its citizens and nationals by January 31, 2028—a date that is almost two years in the future. Furthermore, the Reciprocal Trade Agreement does nothing to change Cambodia's authority to determine whether or not to issue travel documents on a case-by-case basis. *See Nguyen v. Moniz*, No. 26-CV-10741-FDS, 2026 WL 539181, at *4 (D. Mass. Feb. 26, 2026) (finding that a foreign government's discretion whether or not to issue travel documents weighs heavily in favor of the noncitizen's release on habeas).

The facts asserted by the government regarding actual removals belie the reality of the situation. According to Immigration and Customs Enforcement, as of November 2024, there were 1,747 Cambodians living in the community with final orders of removal.“Noncitizens on the ICE Non-Detained Docket with Final Orders of Removal by Country of Citizenship” (“ERO Data”), **Exhibit Q** at 1-2. Out of those 1,747 people, the government asserts that it has submitted to the Cambodian government 121 *requests* for travel documents from February 2025 to present. ECF 14 at 3; ERO Data at 2. However, the United States has only been able to remove 65 Cambodians. ECF 14 at 3. This means that nearly ***half*** of the Cambodians the US sought to remove (65 out of 121) ***were not removed***. Additionally, 65 people removed out of 1,747 eligible to be removed is less than 4%. The government’s position that there is a significant likelihood of removal in the reasonably foreseeable future for an entire group of 1,747 people is not reasonable. ECF 14; ERO Data at 1-2. ICE’s own reports classified Cambodia as “at-risk of non-compliance,” in light of “delaying the issuance of travel documents” and “refusing to accept certain categories of their nationals.” ERO Data at 7.

Even if Cambodia generally accepts repatriation, Respondents have made no individualized showing that Mr. Pen specifically is significantly likely to be removed in the reasonably foreseeable future. The facts of his case cut the other way. Mr. Pen arrived in the United States at age five as a refugee fleeing the Khmer Rouge genocide. Pen Decl. at 2; Pen Sup. Decl. at ¶¶ 10-12. He has no Cambodian passport, no birth certificate, and no government-issued identification from Cambodia. *Id*. He owns no property in Cambodia and does not fluently speak, read, or write the language. *Id*. Mr. Pen has no family remaining in Cambodia, and he does not even know the names of his grandparents. *Id*. These are the exact circumstances which the Cambodian government, in conducting its nationality verification

process, are likely to scrutinize, and which will lead to further delay and the potential denial of his request for travel documents. Ha Decl. at ¶¶ 11-14.

Respondents falsely draw parallels to habeas cases that do not match the circumstances of Mr. Pen's current situation. Although Respondents attempt to attribute a "broad change in circumstances that applies to a broad group of aliens" to changed circumstances within Mr. Pen's situation, Respondents fail to provide proof as to why Mr. Pen should be considered as part of such a broad group, despite the unreasonableness of Respondents' allegations. *Compare Nguyen v. Noem*, No. 6:25-CV-057-H, 2025 WL 2737803, at *7 (N.D. Tex. Aug. 10, 2025) *with Huynh v. Wesling*, No. 1:25-CV-13794-AK, 2026 WL 183467, at *8 (D. Mass. Jan. 23, 2026) (finding that *Nguyen v. Noem* did not apply) *and Nguyen v. Hyde*, 788 F. Supp. 3d 144, 151–152 (D. Mass. 2025) (finding that information regarding the number of individuals removed to the petitioner's country of origin did not show a significant likelihood that the petitioner would be removed in the foreseeable future where government failed to explain "how many of the 328 individuals removed during Fiscal Years 2024 and 2025 were *pre-1995 Vietnamese refugees*, like Mr. Nguyen").

## III. A pending interview with the Cambodian consulate, scheduled a month after re-detainment, is insufficient to show a significant likelihood of *removal* in the reasonably foreseeable future at the time of re-detainment.

The Respondents admit that any removal to Cambodia may not take place before a multi-step process occurs: (1) an interview with the Cambodian government takes place, (2) the Cambodian government makes an individualized determination regarding whether they will issue a travel document; and (3) the United States government effectuates removal, which takes place approximately once every two months. ECF 14, 14-1. The government asserts that Mr. Pen may have an interview this week with the Cambodian government; after that, the Cambodian

government has 30 days to decide whether or not to issue Mr. Pen travel documents; after that, "a removal flight ***should be*** scheduled within two months." ECF 14 at 7 (emphasis added).

However, the government cannot remedy its regulatory violation at the time of re-detainment after the fact of its occurrence by pointing at an interview scheduled over a month after wrongful re-detainment.[2] ECF 14-1 at 5. This alone should warrant Mr. Pen's release. *See Munagi v. McDonald*, 2025 WL 3688023 (D. Mass. Dec. 19, 2025) ("[T]he changed circumstances that make [a noncitizen's] removal likely in the foreseeable future must have existed at or before the [order of supervision] revocation; post-hoc justifications are inadequate."); *see also Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 170 (W.D.N.Y. 2025) (ordering release for petitioner due to regulatory violations during revocation of release irrespective of the fact that ICE had procured a travel document for petitioner during habeas proceedings); *Sun*, 2025 WL 2800037, at *2 (S.D. Cal. Sept. 30, 2025) (finding that ICE's assertion that it was preparing to submit a travel document request to remove petitioner to Cambodia was insufficient to show changed circumstances or a significant likelihood of removal in the reasonably foreseeable future, calling such vague assertions "akin to promising the check is in the mail").

Furthermore, the government admits that removal of Mr. Pen may still take over ***three months***, and it is not even guaranteeing that—it can only say that a flight ***should be*** scheduled, not that one ***is scheduled***. The question here is not whether a ***travel document*** will be issued or

[2] This is the second time Respondents have waited until the day of their briefing deadline to take any action in Mr. Pen's case. They failed to provide him any travel document-related paperwork until the afternoon of February 9, 2026, more than one week after detaining him (and their first reply deadline). Pen Sup. Decl. at 7. Then, on March 6, 2026, almost five weeks later (and the date of a subsequent filing deadline), they claimed to have scheduled his nationality interview. ECF 14-1. Respondents are not pursuing Mr. Pen's potential removal in good faith and Petitioners fear that, in the absence of external pressure such as a court deadline or order, Respondents will continue to allow Mr. Pen to languish in detention.

even when, but rather there is a significant likelihood that the alien may be ***removed*** in the reasonably foreseeable future. The government has failed to do so in ECF 14.

The Supreme Court explicitly rejected the notion that reasonable foreseeability could be determined solely based on government efforts alone. *See Zadvydas*, 533 U.S. at 702 (remanding Fifth Circuit decision after the Fifth Circuit had determined that continued detention was lawful "as long as 'good faith efforts to effectuate . . . deportation continue'"). This Court in a separate session similarly found that more evidence is needed beyond ICE's conclusory statements to justify detention in order to effectuate a final order of removal. *See Pouev v. Smith*, 169 F.Supp. 3d 297, 300 (D. Mass. 2016) (denying motion to dismiss because the Court required additional information to determine foreseeability beyond the submission of a travel document request and an interview with the Cambodian consulate).

**IV. Mr. Pen's detention is not necessary or required for any potential interview.**

In addition to failing to show that removal is significantly likely in the reasonably foreseeable future, the government has also failed to show that Mr. Pen's continued detention is necessary to accomplish that aim. The government's bald assertion that "[a]liens typically need to be detained in ICE custody for the interview to be conducted" is not supported by any facts. ECF 14-1 at 12. Neither the 2002 MOU or the 2025 Reciprocal Trade Agreement articulate any requirement that an individual be detained to conduct the interview. MOU; ECF 14-2. Merely because it is the U.S. government's preferred practice, in violation of due process, to detain people for interviews, does not mean that detention is necessary. Supplemental Affidavit of Eileen L. Morrison ("Morrison Sup. Aff."), **Exhibit P** 4; *See Gomes-Afonseca v. Lyons,* No. 26-CV-10215-AK, 2026 WL 538167*,* at *4 (D. Mass. Feb. 26, 2026) (finding that there is no necessity for Petitioner to continuously be detained to assist ICE obtain their travel document

request from Vietnam given prior compliance with OSUP conditions). Cambodian nationals on OSUP have been able to travel to Washington, D.C., to have in-person interviews at the Cambodian Embassy, demonstrating that being in custody is unnecessary for this part of the process. *Id*. at 5. This is further underscored by Assistant Field Office Director Cleveland's use of the word "typically." ECF 14-1 at 12.

Mr. Pen has shown, through 25 years of compliance with his Order of Supervision and by appearing for dozens of check-ins with ICE—including the one at which he knew he would be detained—that he will appear for any interview that may be scheduled and that he will appear 24 hours in advance of a chartered flight should it be required. Proof of Check-Ins. It is a violation of the regulations and due process to continue Mr. Pen's detention while the government continues to attempt to remove Mr. Pen without any basis to believe that any intended removal is significantly likely in the reasonably foreseeable future.

## V. Immediate release is the proper remedy.

When a noncitizen who was released on an OSUP is re-detained without the initial lawful revocation of their release, the appropriate remedy is to return them to the status quo of release on an OSUP. *See, e.g., Nguyen v. Scott*, 796 F. Supp. 3d 703, 718 (W.D. Wash. 2025) (citing to cases where "several district courts have recently concluded that releasing a re-detained noncitizen who had been on supervised release preserves rather than alters the status quo"); *Liu v. Carter*, No. 25-3036-JWL, 2025 WL 1696526 (D. Kan. Jun. 17, 2025) (finding that even though six months had not yet passed, petitioner was entitled to immediate release because revocation of release did not comport with 8 C.F.R. § 241.13); *Kim v. Moniz*, 1:26-CV-10740-DJC, Doc. No. 8 (D. Mass. Mar. 6, 2026) (ordering release on same conditions

as prior OSUP); *Nguyen v. Moniz*, No. 26-CV-10741-FDS, 2026 WL 539181, at *4 (D. Mass. Feb. 26, 2026).

## VI. Conclusion

Mr. Pen has been unlawfully detained now for five weeks. To date, Respondents have not met their burden under *Kong* or the regulations to show that there was an "individualized determination" that "removal has become significantly likely in the reasonably foreseeable future" prior to revocation of release.

Generalized statistics and the theoretical future repatriation of almost 2,000 Cambodian individuals do not demonstrate that an individualized determination was made regarding Mr. Pen, much less prior to his re-detention. Despite a brief mention of repatriation in an otherwise unrelated trade agreement, Respondents have not shown that the Cambodian government has changed their comprehensive, discretionary, case-by-case process for considering, vetting, and approving travel document requests.

After over one month of his detention, there is still no travel document in hand or planned removal for Mr. Pen. As such, this Court should order the immediate release of Mr. Pen due to the government's violations of both their own regulations and Mr. Pen's due process rights. Should the government wish to continue trying to obtain a travel document for Mr. Pen, this can be accomplished with him out of custody.

Respectfully submitted,
KCHANG PEN
Petitioner

By his attorney,
*/s/ Alysia Madan*
Alysia Madan
BBO# 709423

Greater Boston Legal
Services, 197 Friend Street
Boston, MA 02114
Tel: 585-406-4354
Email: AMadan@gbls.org
Date: March 9, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants via first-class mail.

*/s/ Alysia Madan*

Alysia Madan

Date: March 9, 2026